UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JANAY DRAIN O/B/O,
D.S., MINOR,
    Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:12-cv-759

Beckwith, J.
Litkovitz, M.J.

REPORT AND
RECOMMENDATION

Janay Drain, on behalf of her son, D.S. (plaintiff), brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application for Supplemental Security Income (SSI) childhood disability benefits. This matter is before the Court on plaintiff's Statement of Errors (Doc. 14) and the Commissioner's response in opposition. (Doc. 15)

**I. Procedural Background**

Plaintiff was born in June 2009 and was 2 years, 1 month old at the time of the administrative law judge's (ALJ) decision. Plaintiff's mother, Janay Drain, filed an application for SSI benefits on his behalf in September 2009, alleging disability due to Van der Woude Syndrome (VDS).[1] (Tr. 166). His application was denied initially and upon reconsideration. Plaintiff requested and was granted a *de novo* hearing before ALJ George Gaffaney. Plaintiff's mother, who was represented by counsel, appeared and testified on plaintiff's behalf at the ALJ

---

[1] Van der Woude Syndrome is "an autosomal dominant syndrome characterized by a cleft lip or cleft palate, distinctive pits of the lower lips, or both." http://emedicine.medscape.com/article/950823-overview.

hearing. On July 14, 2011, the ALJ issued a decision denying plaintiff's SSI application. (Tr. 9-15). The Appeals Council denied plaintiff's request for review, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Medical Evidence

The record contains treatment notes from Cincinnati Children's Hospital ("Children's"), where plaintiff was treated for VDS. Plaintiff was first examined at Children's at age one week by Dr. Nancy D. Leslie, M.D., a clinical geneticist who diagnosed plaintiff with VDS, consisting of an incomplete right-sided cleft lip with evidence of a cleft palate and lip pits. (Tr. 187-89). As of the date of the examination, he had good weight gain and was eating well. (Tr. 189). Plaintiff was subsequently seen by clinical nurse specialist Patricia Bender in the Genetics Office at Children's on June 23, 2009, for ongoing feeding difficulties associated with his cleft lip. (Tr. 177- 179). The notes stated that plaintiff had been diagnosed with a cleft lip and lip pits consistent with VDS. (Tr. 177). Plaintiff was being fed breast milk from a "Mead-Johnson cleft palate feeder." (*Id.*). Except for a one-centimeter hyperpigmented patch on the face, the review of systems was negative. (*Id.*). Plaintiff was noted to be alert and active during the examination, to be responding appropriately to environmental stimuli, and to be easily consoled when held. (Tr. 178). The plan was to see plaintiff back in the clinic in one month to ensure he was continuing to feed and grow appropriately. (*Id.*). Closure of the cleft lip was scheduled for September 2009. (Tr. 178).

At five weeks old, prior to repair of his cleft lip, plaintiff and his mother were seen at the Children's Breast Feeding Clinic for evaluation. (Tr. 141-147). Plaintiff had been bottle fed

2

with breast milk up to his point. (Tr. 146). Dr. Sheela Geraghty, M.D., encouraged plaintiff's mother to breast feed plaintiff but was doubtful her attempts would be successful more so because plaintiff had been bottle fed for five weeks prior to any attempt to breast feed him than because of his cleft lip. (Tr. 141, 146).

Clinical nurse specialist Bender saw plaintiff in the Genetics Clinic for his two-month check-up on August 10, 2009. (Tr. 164-66). She noted plaintiff had last been seen in the clinic at 13 days of age on June 23, 2009, and since that date he had not had any significant illness, hospitalizations or surgeries. (Tr. 164). It was noted that plaintiff was drinking approximately five ounces of breast milk from a Mead-Johnson feeder every 1½ to 2 hours during the day and was sleeping from 10:00 p.m. until 4:00 to 6:00 a.m. (*Id*.). His newborn hearing evaluation was normal. Surgery to repair his cleft lip was scheduled for the following month. Except for the hyperpigmented patch on his face, the remainder of the review of systems was negative. Nurse Bender reported that plaintiff was alert and active during the examination; he responded appropriately to environment stimuli; he was able to fix and follow; he brought his hands to his mouth; he was "cooing and smiling socially"; and he was not enrolled in any type of early intervention program. (*Id*.). It was anticipated that plaintiff would transition to a regular bottle after the cleft lip surgery. (Tr. 166). The plan was to proceed with surgery to repair the cleft lip on September 9, 2009, and perform surgery to remove the lip pits at a later time; schedule a dental appointment in one year; and follow-up with plaintiff at one year of age. (*Id*.).

3

Dr. Christopher Gordon, M.D., performed a cleft lip repair with tip rhinoplasty at Children's on September 9, 2009. (Tr. 171-72). Plaintiff tolerated the procedure well. (Tr. 172). He had no post-operative complications. (Tr. 127).

On September 28, 2009, at 3½ months of age, plaintiff and his mother were again seen in the Breastfeeding Clinic. (Tr. 127-129). Dr. Geraghty reported that plaintiff's mother did not want to breast feed plaintiff following repair of his cleft lip but preferred to pump her breast milk and bottle feed him. (Tr. 127). Dr. Geraghty performed an examination of plaintiff and reported that according to his mother, plaintiff had done very well since his surgery. The notes state that plaintiff took the bottle well. (*Id.*). Plaintiff's mother reported that the nasal prongs, which plaintiff was required to keep in at all times for two months, came out regularly but she knew how to reinsert them. (*Id.*). Dr. Geraghty described plaintiff's general appearance as "alert, well nourished, well hydrated . . . very happy and interactive-smiles constantly." (Tr. 128). On examination, his ears were normal; a cleft repair was obvious but well-healed; he sucked well on the bottle; and he still had "pits" in his bottom lip. (*Id.*). Dr. Geraghty reported: "[Plaintiff] looks wonderful at this visit. Very interactive and social. He [has] doubled his birthweight-which is excellent!" (Tr. 129). She noted he had a follow-up appointment with the craniofacial team in two weeks, at which time his mother hoped to get permission to start him on foods. (*Id.*). Dr. Geraghty noted that plaintiff was ready for foods as he had "excellent head control." (*Id.*).

On June 9, 2010, Dr. Gordon wrote a narrative note which set forth plaintiff's current history. (Tr. 207). He reported that plaintiff had developed some minor notching of the "white

4

roll" following the cleft lip repair, "PE tubes" had been placed, and he had required some Kenalog injection to the scar. Excision of the lip pits and a lip revision were anticipated to be the next surgical procedure. It was expected plaintiff would require a few sets of ear tubes before five to seven years of age and that at age seven the final plastic surgery would be performed, which was an alveolar bone grafting to fill in his notched alveolus. Absent any other complications, Dr. Gordon anticipated that ear tubes would cover his likely otologic issues,[2] and that plaintiff would require orthodontic therapy.

Dr. Gordon performed a surgical cleft lip revision and excision of lower lip pits on July 9, 2010. (Tr. 211-12). Dr. Gordon saw plaintiff for post-operative follow-up on August 24, 2010, at which time he reported that plaintiff was doing "remarkably well and aside from a bit of fullness in the vermillion the family has been doing an excellent job with scar massage and stretching over the scar. His white roll is now symmetric. There is a bit of edema obviously on the surgically repaired side, but otherwise he is doing quite well." (Tr. 217). Dr. Gordon reported that plaintiff was back to eating his normal diet, and there were no further recommendations. (*Id.*).

Plaintiff was seen for follow-up on April 29, 2011, at 22 months of age. (Tr. 215-16). He was assessed as having a stable post cleft lip and nasal repair, and the only abnormal findings aside from the cleft lip were eczema and a well-healed forearm burn. (*Id.*).

---

[2] "Otological" refers to "the branch of medicine that deals with the structure, function, and pathology of the ear." http://www.thefreedictionary.com/Otologic.

Plaintiff's hearing was tested on June 20, 2011, due to a history of a repaired cleft lip and bilateral wax impaction. (Tr. 219-21). The test results showed elevated responses for plaintiff's age in the better ear and a suggestion of a conductive component in at least one ear; however, the report noted that plaintiff was noisy during testing and the elevated responses could be due to his level of activity. (Tr. 219). It was recommended that his hearing be retested following treatment. (*Id.*).

State agency physician Dr. Malika Haque, M.D., reviewed the file in November 2009 when plaintiff was five months old and found that his impairment of a repaired cleft lip was not severe. (Tr. 194-99). Dr. Haque noted that at the age of 3½ months plaintiff was very interactive and social, his birth weight had doubled, he was doing well, and the plan was to start him on foods as he excellent head control. (Tr. 194). Dr. Haque found that plaintiff's growth, development and functions were age-appropriate, he was feeding very well, and he had doubled his weight by four months of age. (*Id.*). State agency physician Dr. Silvia Vasquez, M.D., affirmed Dr. Haque's assessment on March 16, 2010, finding plaintiff's growth, development and functioning were all age-appropriate and that no health problems other than his repaired cleft lip were alleged or noted in the medical evidence of record. (Tr. 200-05).

### III. Analysis

#### A. Legal Framework for Children's SSI Disability Determinations

To qualify for SSI, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. *Id.*. An individual under

6

the age of 18 is considered disabled for purposes of SSI "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

The Social Security regulations set forth a three-step sequential analysis for determining whether a child is disabled for purposes of children's SSI benefits:

>    1. Is the child engaged in any substantial gainful activity?  If so, benefits are denied.
>
>    2. Does the child have a medically severe impairment or combination of impairments?  If not, benefits are denied.
>
>    3. Does the child's impairment meet, medically equal, or functionally equal any in the Listing of Impairments, Appendix I of 20 C.F.R. pt. 404, subpt. P?  If so, benefits are granted.

20 C.F.R. § 416.924(a)-(d).  An impairment that meets or medically equals the severity of a set of criteria for an impairment in the Listing, or that functionally equals a listed impairment, causes marked and severe functional limitations.  20 C.F.R. § 416.924(d).

In determining whether a child's impairments functionally equal the Listings, the adjudicator must assess the child's functioning in six domains:

>    1. Acquiring and using information;
>
>    2. Attending and completing tasks;
>
>    3. Interacting and relating with others;
>
>    4. Moving about and manipulating objects;
>
>    5. Caring for yourself; and

7

  6. Health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi). To functionally equal an impairment in the Listings, an impairment must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d). The relevant factors that will be considered in making this determination are (1) how well the child initiates and sustains activities, how much extra help he needs, and the effects of structured or supportive settings; (2) how the child functions in school; and (3) how the child is affected by his medications or other treatment. 20 C.F.R. § 416.926a(a)(1)-(3).

  An individual has a "marked" limitation when the impairment "interferes seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A "marked" limitation is one that is "more than moderate" but "less than extreme." *Id.* An "extreme" limitation exists when the impairment "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation may also seriously limit day-to-day functioning. *Id.*

  If the child's impairments meet, medically equal, or functionally equal the Listings, and if the impairments satisfy the Act's duration requirement, then the child is considered disabled. 20 C.F.R. § 416.924(d)(1). If both of these requirements are not satisfied, then the child is not considered disabled. 20 C.F.R. § 416.924(d)(2).

  In determining functional equivalence, the ALJ must consider the "whole child." Social Security Ruling 09-1p, 2009 WL 396031, at *2 (Feb. 17, 2009). The "whole child" approach to functional equivalence requires the ALJ to consider the following questions:

1. How does the child function? "Functioning" refers to a child's activities; that is, everything a child does throughout the day at home, at school, and in the community, such as getting dressed for school, cooperating with caregivers, playing with friends, and doing class assignments. We consider:

- What activities the child is able to perform,

- What activities the child is not able to perform,

- Which of the child's activities are limited or restricted,

- Where the child has difficulty with activities-at home, in childcare, at school, or in the community,

- Whether the child has difficulty independently initiating, sustaining, or completing activities,

- The kind of help, and how much help the child needs to do activities, and how often the child needs it, and

- Whether the child needs a structured or supportive setting, what type of structure or support the child needs, and how often the child needs it.

2. Which domains are involved in performing the activities? We assign each activity to any and all of the domains involved in performing it. Many activities require more than one of the abilities described by the first five domains and may also be affected by problems that we evaluate in the sixth domain.

3. Could the child's medically determinable impairment(s) account for limitations in the child's activities? If it could, and there is no evidence to the contrary, we conclude that the impairment(s) causes the activity limitations we have identified in each domain.

4. To what degree does the impairment(s) limit the child's ability to function age-appropriately in each domain? We consider how well the child can initiate, sustain, and complete activities, including the kind, extent, and frequency of help or adaptations the child needs, the effects of structured or supportive settings on the child's functioning, where the child has difficulties (at home, at school, and in the community), and all other factors that are relevant to the determination of the degree of limitation.

*Id.* (internal citations omitted). Importantly, SSR 09-01p goes on to provide more detail about the technique for determining functional equivalence but emphasizes:

> [W]e do not require our adjudicators to discuss all of [these] considerations [] in their determinations and decisions, only to provide sufficient detail so that any subsequent reviewers can understand how they made their findings.

*Id.* at 3.

## B. The Administrative Law Judge's Findings

The ALJ made the following findings of fact and conclusions of law:

1. The [plaintiff] was born [in] June . . . 2009. Therefore, he was a newborn/young infant on September 11, 2009, the date application was filed, and is currently an older infant (20 CFR 416.926a(g)(2)).

2. The [plaintiff] has not engaged in substantial gainful activity since September 11, 2009, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3. The [plaintiff] has the following severe impairment: Van der Woude Syndrome . . . (20 CFR 416.924(c)).

4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5. The [plaintiff] does not have an impairment or combination of impairments that functionally equals the listings (20 CFR 416.924(d) and 416.926a).

6. The [plaintiff] has not been disabled, as defined in the Social Security Act, since September 11, 2009, the date the application was filed (20 CFR 416.924(a)).

(Tr. 12-15).

10

In determining that plaintiff's impairments were not functionally equivalent to a listed impairment, the ALJ found:

1. Plaintiff has no limitation in acquiring and using information. (Tr. 13).

2. Plaintiff has no limitation in attending and completing tasks. (Tr. 13).

3. Plaintiff has no limitation in interacting and relating to others. (Tr. 13-14).

4. Plaintiff has no limitation in moving about and manipulating objects. (Tr. 14).

5. Plaintiff has less than marked limitation in the ability to care for himself. (Tr. 14).

6. Plaintiff has less than marked limitation in health and physical well-being. (Tr. 15).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In

deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545-46 (6th Cir. 2004) (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

On appeal, plaintiff's mother, who is proceeding pro se, has submitted a one-page Statement of Errors on plaintiff's behalf asserting that the ALJ erred by failing to find that plaintiff is disabled because he has suffered from marked and severe physical impairments from birth. (Doc. 14). The arguments offered in support of plaintiff's position are: (1) plaintiff had to be fed from "Haberman" bottles, a specific bottle used to bottle feed babies with cleft lip, due to his VDS; (2) plaintiff has been attending twice-monthly speech pathology sessions at Children's for 18 months due to a speech delay caused by VDS; and (3) plaintiff will undergo future surgeries to attempt to correct his nasal speech and dental and facial issues caused by VDS, so as to enable plaintiff to have a normal development.

12

**1. The ALJ's finding that plaintiff has no limitations in the first four domains of functioning is supported by substantial evidence**.

Plaintiff has presented no arguments, and has cited no evidence, to show that plaintiff is limited in the first four domains of: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; and (4) moving about and manipulating objects. To the contrary, the medical records indicate that plaintiff's development has proceeded at a normal pace and that he has interacted appropriately with others throughout his infancy. (See Tr. 177-79- report of two-week examination; Tr. 164-66- report of two-month examination; Tr. 127-29- report of 3½ month old examination; Tr. 217- report of post-operative follow-up at age 22 months). There is no allegation of a limitation in plaintiff's ability to acquire and use information. While a hearing impairment or a repaired cleft palate which makes a child's speech difficult to understand can adversely affect a child's ability to interact and relate appropriately (*see* SSR 09-5p, 2009 WL 396026, at *2-3 (Feb. 17, 2009)), there is no evidence here that plaintiff's ability to interact and relate has been impacted by a hearing or speech impairment. Nor is there any allegation that plaintiff is limited in his ability to move about and manipulate objects. Finally, the record does not include evidence that shows plaintiff's ability to attend and complete tasks is impacted by his physical impairment. Accordingly, the ALJ's finding that plaintiff has no limitations in the first four domains of functioning is supported by substantial evidence.

### 2. The ALJ's finding that plaintiff has less than marked limitation in the fifth and sixth domains is supported by substantial evidence.

The fifth domain, caring for yourself, considers how well a child maintains a healthy emotional and physical state. 20 C.F.R. § 416.926a(k). This includes how well a child satisfies his physical and emotional wants and needs in appropriate ways; how the child copes with stress and changes in the environment; and how well the child takes care of his own health, possessions, and living area. *Id*.

In determining that plaintiff has less than marked limitation in the domain of caring for himself, the ALJ found:

> The child's limitations do not rise to marked because he is demonstrating his body signals and adapting in a developmentally appropriate way. [Tr. 206-07, 208-14]. While the child's VDS will cause some limitation in his ability to be independent, the limitation will not cause [] the claimant to behave in a developmentally inappropriate way. Further, there is no allegation or credible evidence which would suggest the child manifests behaviors analogous to those set forth in the regulations as examples of marked or extreme limitations. . . .

(Tr. 14).

There is no allegation which indicates that contrary to the ALJ's finding, plaintiff has marked limitation in this area. Although plaintiff required additional help with feeding as an infant and will continue to require some additional assistance as a result of his VDS, such as with his speech, the record includes no evidence that shows his VDS has markedly limited his ability to care for himself. The ALJ's finding that plaintiff has less than marked limitation in the domain of caring for yourself is substantially supported by the record.

14

The sixth domain, the health and physical well-being domain, considers the cumulative physical effects of physical and mental impairments and their associated treatments on a child's health and functioning. *See* Social Security Ruling 09-8p, 2009 WL 396030, at *3 (Feb. 17, 2009). This domain addresses impacts such as the effect of recurrent illness, the side effects of medication, and the effect of the need for ongoing treatment on the child's body. *Id.* In determining that plaintiff has less than marked limitation in the domain of health and physical well-being, the ALJ stated:

> Almost all of the allegations made at [the] hearing pertained to this domain. While the evidence does show that the child may need future surgery, the potential for future treatment, which exists in nearly every chronic condition, is insufficient to arise to a marked limitation. [Tr. 219-221]. To rise to a marked limitation, there must be a showing that a pervasive pattern of manifestations of the impairments cause the child to face significant limitations in day-to-day functioning. There is no evidence of that in this case. To the contrary, even though [plaintiff] will deal with VDS and the effects of it for the duration of his life, the limitations are not so great as to preclude functioning. . . .

(Tr. 15).

A review of the record shows there is no evidence that the cumulative effects of plaintiff's VDS have markedly limited his health and physical well-being. There is evidence that plaintiff may need future surgery, but the potential need for future surgical treatment does not constitute a marked limitation on plaintiff's health and physical well-being. Nor is there any evidence that plaintiff's health and physical well-being is markedly limited by a speech impairment. Thus, the ALJ's determination that plaintiff had less than marked limitation in the domain of health and physical well-being is substantially supported by the record.

15

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date: 1/14/2014

Karen L. Litkovitz
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JANAY DRAIN O/B/O,
D.S., MINOR,
    Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:12-cv-759

Beckwith, J.
Litkovitz, M.J.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Janay Drain
2644 Losantiville Ave, #4
Golf Manor, OH 45237

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ✓
☑ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail  ☐ Express Mail
☐ Registered      ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
(Transfer from service label)   7011 3500 0001 5345 9923

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540